******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* RUBEN ROMAN
(SC 19474)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued October 16, 2015—officially released February 9, 2016*

*Ilana R. N. Ofgang*, assigned counsel, for the appellant (defendant).

*Nancy L. Walker*, deputy assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Robin D. Krawczyk*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ESPINOSA, J. This direct appeal, following an inquiry into allegations of juror misconduct, comes to us almost sixteen years after the defendant, Ruben Roman, was convicted of murder in violation of General Statutes (Rev. to 1997) § 53a-54a, assault in the first degree in violation of General Statutes § 53a-59 (a) (1), criminal possession of a pistol in violation of General Statutes (Rev. to 1997) § 53a-217c (a) (1), and risk of injury to a child in violation of General Statutes (Rev. to 1997) § 53-21. The defendant claims that the trial court improperly rejected his claim of alleged juror misconduct and his related claim that the unusually extended delay in scheduling a postremand inquiry into the alleged misconduct violated his constitutional right to due process and a fair trial. In the defendant's first appeal to this court, we reversed in part the judgment of the Appellate Court, which had rejected the defendant's claim that the trial court abused its discretion in failing to conduct an inquiry into the defendant's juror misconduct allegations. *State* v. *Roman*, 262 Conn. 718, 729, 817 A.2d 100 (2003). We remanded the case with instruction to the trial court to conduct an inquiry into the defendant's claim. Id. In 2013—following a decade long delay—the trial court held the mandated inquiry, found no evidence of juror misconduct, and denied the defendant's request to vacate his conviction and for a mistrial. We conclude that the trial court properly found no evidence of juror misconduct and the delay on remand did not violate the defendant's right to due process. Accordingly, we affirm the judgment of the trial court.

The following facts are relevant to the defendant's claims before this court. On the evening of December 24, 1997, the defendant and his girlfriend, Maria Torres-Arroyo, hosted a holiday gathering at their home in East Hartford. Id., 721. Throughout the night, the defendant consumed cocaine and a number of alcoholic beverages. Id. At approximately 3 a.m. on December 25, 1997, the defendant returned home after driving several family members back to their respective residences. Id. Upon entering the house, the defendant encountered Torres-Arroyo sitting at a table with her brother-in-law from a prior marriage, Israel Arroyo, and her minor son and her nephew. Id. The defendant and Torres-Arroyo began to have a heated argument that rapidly escalated and culminated in the defendant firing a .45 caliber semiautomatic pistol at both Torres-Arroyo and Arroyo. Id. Although Torres-Arroyo survived, Arroyo subsequently died from his wounds while being transported to the hospital. Id.

On January 19, 2000, the jury found the defendant guilty of all charges. Id. Judge Wollenberg held a sentencing hearing on March 13, 2000. Id. At the sentencing hearing, the defendant informed the court of a potential instance of juror misconduct, but did not provide any

evidence as he had been unable to reach an attorney he had recently retained who allegedly had evidence of the misconduct. Id., 722–23. The defendant sought a continuance to allow him to present evidence of the alleged misconduct, but the court denied the continuance without conducting an inquiry into the defendant's allegations and rendered judgment of guilty in accordance with the verdict. Id. The defendant appealed to the Appellate Court, which affirmed the trial court's decision; *State* v. *Roman*, 67 Conn. App. 194, 197, 786 A.2d 1147 (2001); and then appealed to this court, which reversed in part the judgment of the Appellate Court and remanded the case to the Appellate Court with direction to remand the case to the trial court with direction to conduct an inquiry into the defendant's juror misconduct claim. *State* v. *Roman*, supra, 262 Conn. 720.

Following a ten year delay in scheduling the inquiry, the facts of which are relevant to the defendant's due process claim and are set forth in part II of this opinion, the defendant's postremand hearing before Judge Dewey began on February 6, 2013. At the hearing, the defendant presented the testimony of Mary Eason, who claimed to have overheard juror misconduct on a public bus and mentioned it to her boyfriend, Hiram Rodriguez. Additionally, the defendant was able to summon the entire jury from his original criminal trial, as well as two of the three alternate jurors, the third having died prior to the hearing.

At the hearing, the defendant presented evidence of two different allegations of juror misconduct, namely that (1) a juror had potentially discussed the case with members of the public, and (2) two alternate jurors exchanged communications during trial. The defendant's first and main allegation was grounded in Eason's testimony. Eason testified that on several days in 2000 between 6 a.m. and 6:30 a.m. she heard a group of individuals discussing the defendant's case on a public bus that travels from Hartford to East Hartford. Although Eason was not personally acquainted with the defendant, she recognized his name and the details of his case from conversations with Rodriguez, who was a friend of the defendant. Although Eason only heard snippets of the conversations, she testified that the participants mentioned that one of the jurors was speaking with them, but it was Eason's belief that the juror was not on the bus.[1] After overhearing the conversations on the bus, Eason mentioned them to Rodriguez. Rodriguez then visited the defendant in jail prior to the sentencing hearing and informed him of Eason's observations. Apart from that, Eason did not recall much of what the passengers actually said.

All twelve regular jurors and two of the alternate jurors from the defendant's original criminal trial also testified at the hearing. All regular members of the jury

testified that they did not discuss any aspects of the trial outside of the courtroom, nor did they use the public bus system during the trial or at any other time. One juror, N.M.,[2] testified that she knew some people who used public transportation, but none who would have been on the same bus as Eason. One of the alternate jurors, P.M., testified that although he had several coworkers that used public buses, he never discussed any aspects of the trial with them nor did he think they would have been on Eason's bus. The other alternate juror, M.M., testified that several of the employees at his company used the public bus system, but stated that he never discussed the defendant's case with any of his employees. M.M. acknowledged that he did discuss the case with his wife during the trial, but testified that his wife would have had no opportunities to mention these discussions with any of M.M.'s employees or anyone else that rode the bus.

The defendant's second allegation of juror misconduct was that two of the alternate jurors communicated with each other during the trial. M.M. testified that he exchanged "little comments" as well as nonverbal communications with P.M.—who sat next to him in the jury box—during the course of the defendant's trial. M.M. testified that prior to his and P.M.'s dismissal as alternates, he would roll his eyes and exchange looks with P.M. whenever the defense presented a line of argument he did not find compelling. The exchanges only passed between M.M. and P.M. and did not involve any other members of the jury. One of the regular jurors, D.C., testified that while seated in the jury box he was unaware of any exchanges occurring between other jurors.

In May, 2013, both parties submitted briefs to the trial court based on the evidence adduced at the hearing. In his brief, the defendant argued for a new trial on the basis of the alleged juror misconduct. In her September 13, 2013 memorandum of decision, Judge Dewey denied the defendant's request for a new trial. Judge Dewey found that the evidence did not support the defendant's allegations, as there was nothing to indicate that the conversations that Eason overheard referenced any information relayed by deliberating jurors, as opposed to information obtained from media coverage. Judge Dewey also found that the credible and cumulative testimony of all the regular jurors established that none of them participated in any juror misconduct. Accordingly, Judge Dewey denied the defendant's request for a new trial.

Following Judge Dewey's denial of his request to vacate his conviction and for a mistrial, the defendant appealed directly to this court.[3] On appeal, the defendant raises similar arguments to those initially presented to Judge Dewey following the postremand hearing. First, the defendant argues that given Eason's

testimony and the communications between alternate jurors P.M. and M.M., Judge Dewey erroneously concluded that there was no evidence to support a finding of juror misconduct. Second, the defendant argues that Judge Dewey incorrectly concluded that his right to a fair trial was not violated by the delay in scheduling the postremand hearing. In response, the state counters that the evidence introduced by the defendant at the postremand hearing failed to establish a violation of his right to a fair trial before a panel of impartial jurors. The state also argues that, despite the defendant's argument to the contrary, the scheduling delay did not violate the defendant's rights because it did not prevent him from fully presenting his juror misconduct claim. We agree with the state on both claims.

I

Under the constitution of Connecticut, article first, § 8, and the sixth amendment to the United States constitution, the right to a trial by jury "guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors." (Internal quotation marks omitted.) *State* v. *Brown*, 235 Conn. 502, 523, 668 A.2d 1288 (1995). In cases where a defendant alleges juror bias or misconduct, the defendant may be entitled to a new trial if he can raise his allegations from "the realm of speculation to the realm of fact." (Internal quotation marks omitted.) *State* v. *Feliciano*, 256 Conn. 429, 449, 778 A.2d 812 (2001). In such cases, we ask "whether or not the [jury] misconduct has prejudiced the defendant to the extent that he has not received a fair trial." (Internal quotation marks omitted.) *State* v. *Rhodes*, 248 Conn. 39, 47, 726 A.2d 513 (1999). It is well settled that if "the trial court is directly implicated in juror misconduct, the state bears the burden of proving that misconduct was harmless error." (Internal quotation marks omitted.) Id. If, however, the trial court is not at fault for the alleged juror misconduct, "we have repeatedly held that a defendant who offers proof of juror misconduct bears the burden of proving that actual prejudice resulted from the misconduct." (Internal quotation marks omitted.) Id.

Finally, when reviewing claims of juror misconduct on appeal we recognize that "the trial court has wide latitude in fashioning the proper response to allegations of juror [misconduct]. . . . We [therefore] have limited our role, on appeal, to a consideration of whether the trial court's review of alleged jur[or] misconduct can fairly be characterized as an abuse of its discretion." (Internal quotation marks omitted.) *State* v. *West*, 274 Conn. 605, 649, 877 A.2d 787, cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005).

The defendant presents two alleged instances of juror misconduct as having violated his right to a fair trial. First, the defendant relies on Eason's testimony to demonstrate that one of the jurors allegedly communicated

information about the trial to a third party. Second, the defendant argues that the comments and the eye rolling and glances exchanged between alternate jurors P.M. and M.M. constituted an impermissible communication between the alternate jurors and the twelve regular jurors. As the trial court is not at fault for either allegation of misconduct, the defendant bears the burden of demonstrating prejudice. *State* v. *Rhodes*, supra, 248 Conn. 47. We conclude, however, that the defendant has failed to carry his burden on both allegations of misconduct.

Although Eason testified that she heard a group of bus passengers mention the defendant's name and believed that they were discussing the defendant's case, she also testified that she only heard "bits and pieces" of the conversation. Importantly, Eason testified that the passengers were only discussing the court proceedings and specifically testified that they were *not* discussing the content of the jury deliberations. Thus, even though Eason testified that she overheard a passenger state that he or she was in contact with a juror, there is no evidence that the supposed juror leaked any information about the jury's deliberations.

Indeed, there is an utter lack of evidence suggesting that any of the jurors leaked any information—about the deliberations or otherwise—to an individual who used the same public transportation system as Eason. In her memorandum of decision, Judge Dewey found that all of the regular and alternate jurors testified credibly that they did not engage in any of the alleged conversations overheard by Eason, nor was there any evidence that any of the participants in the conversations on the bus received any information from any of the jurors, as opposed to media reports.[4] The defendant counters this fact with the argument that because regular juror N.M. and alternates M.M. and P.M. all testified that they knew individuals who used public transportation, they "had the opportunity" to relay information about the trial to individuals who could have been on the same bus as Eason. Although the jurors may have had the opportunity to converse with acquaintances that used the public bus system, N.M., M.M., and P.M. all testified that they had no such conversations.

Furthermore, it bears mentioning that the opportunity for a juror to commit misconduct is a far cry from a juror who actually does commit misconduct. Theoretically, every juror in every trial always has the potential to take some action that could prejudice the defendant's right to a fair trial. The vast majority of those called to jury service, however, approach their duty seriously and abide by their oaths as jurors. As one of our sister courts once wryly observed, for the opportunity for misconduct to be removed entirely, "the jury would have to be consigned to a dungeon to consider [its] verdict . . . ." *People* v. *Strause*, 290 Ill. 259, 281, 125

N.E. 339 (1919). Were we to accept the defendant's argument and hold that the mere opportunity for a juror to commit misconduct is comparable to actual misconduct and therefore warrants a new trial, "few trials would be constitutionally acceptable." (Internal quotation marks omitted.) *State* v. *Johnson*, 288 Conn. 236, 249, 951 A.2d 1257 (2008). We do not find the defendant's argument in this vein to be persuasive.

Accordingly, we conclude that it was not an abuse of discretion for Judge Dewey to deny the defendant's request for a new trial on the basis of Eason's testimony. Judge Dewey's finding of fact regarding Eason's testimony was that Eason overheard the defendant's name in another person's conversation. Indeed, this is the only conclusion that may be definitively drawn from Eason's testimony, which does not conclusively establish that a juror was on the bus or that a juror related any information about the trial to a passenger. As Judge Dewey noted, there is nothing to indicate that the passengers' information did not come from a benign source, such as media coverage. Given that the conversations occurred in the same time frame as when the verdict was announced and that the passengers were riding a bus in the town where the defendant committed his crimes, it is possible that the passengers' conversations were inspired by nothing more than local interest. As the defendant could not demonstrate juror misconduct based on Eason's testimony, Judge Dewey did not abuse her discretion in denying the defendant's request for a new trial on these grounds.

The defendant also argues that the "little comments" and the eye rolling and skeptical glances exchanged between alternates M.M. and P.M. influenced the regular jurors, and therefore constituted impermissible third-party communications that merited Judge Dewey granting his request for a new trial. Again, we conclude that the trial court did not abuse its discretion in denying the defendant a new trial on these grounds, as the defendant cannot show that the conduct of M.M. and P.M. tainted the regular jurors and thereby violated his right to a fair trial.

The defendant asserts that alternates P.M. and M.M. engaged in continuous commentary during the trial and opined on the defendant's guilt while sitting in the jury box next to the regular members of the jury. The testimony of both P.M. and M.M. at the postremand hearing presents a different picture. P.M. testified that during the trial he did not communicate with any other person about the proceedings. M.M. testified that although he exchanged comments with P.M. and rolled his eyes and gave "little looks" to P.M. while sitting at the end of the back row of the jury box, he and P.M. "weren't in conversation" about the substance of the case. M.M. testified that these exchanges only occurred between himself and P.M. and did not involve any members of

the regular jury. The only regular juror that was directly asked about other jurors communicating, D.C., testified that he was unaware of such actions occurring in the jury box. Tellingly, it would appear that neither Judge Wollenberg nor defense counsel became aware of M.M.'s objectionable conduct over the course of the trial. See *United States* v. *Fazio*, 770 F.3d 160, 169 (2d Cir. 2014) (United States District Court judge dismissed juror for, among other things, rolling her eyes, smirking, and exchanging knowing glances with other jurors during trial).

We are unaware of any existing Connecticut precedent holding that actions akin to those in the present case constitute juror misconduct. Many of our prior decisions addressing juror misconduct involve claims of misconduct that occurred outside of the courtroom. See *State* v. *Johnson*, supra, 288 Conn. 254–55. In those cases that do address in-court conduct similar to that which occurred in the present case, we have not held that such conduct rose to the level of prejudicial juror misconduct. See *State* v. *Ross*, 230 Conn. 183, 227, 228, 646 A.2d 1318 (1994) (no misconduct where juror " 'smiled broadly' " at victim's father when verdict was announced), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); *Lachira* v. *Sutton & Sutton Esquires*, 143 Conn. App. 15, 24, 68 A.3d 1177 (no misconduct where juror allegedly " 'saluted' " defendant and turned to look at him when exiting courtroom), cert. denied, 310 Conn. 922, 77 A.3d 140 (2013). To be clear, there may be cases where a juror's courtroom actions rise to the level of misconduct and unfairly prejudice the defendant. The present case, however, is not one of those. Although we do not sanction the alternate jurors' indecorous courtroom conduct, we cannot conclude from the evidence presented that their side comments, eye rolling and shared glances amount to juror misconduct. P.M. and M.M. testified—and Judge Dewey found—that neither alternate juror discussed the substance of the case prior to their dismissal before deliberations began. Thus, there was no abuse of discretion in Judge Dewey's denial of the defendant's request for a new trial on these grounds.

Despite the testimony of D.C. to the contrary, and the fact that the trial court and the regular jurors seem to have been unaware of the alternate jurors' exchanges, the defendant argues that the rest of the jury must have seen their exchanges and were thereby negatively influenced. In support of this argument, the defendant suggests that we should treat the alternate jurors as third parties[5] and presume both that the regular jurors witnessed the conduct and that the defendant was thereby prejudiced, requiring the state to rebut the presumption of prejudice.

In cases where there is contact between third parties and jurors regarding a matter before the jury, the burden

shifts to the state "to establish that the contact was harmless." (Internal quotation marks omitted.) *State* v. *Berrios*, 320 Conn. 265, 294, A.3d (2016). We recognize, however, that "evidence, rather than speculation, is required to shift the burden of proof to the state." Id., 293. In the present case, the defendant's claim of third-party contact does not move beyond the realm of speculation and the defendant thereby retains a burden he cannot carry given the evidence in the record. Witness testimony at the postremand hearing simply does not support the defendant's theory that the other jurors were aware of the exchanges between M.M. and P.M. M.M. testified that the communications involved no other members of the jury. D.C., the only juror that was directly asked about the actions of other jurors, testified that he was entirely unaware of any such conduct.[6] As both P.M. and M.M. were dismissed from jury service prior to deliberations, there is no possibility that the alternate jurors' actions influenced the regular jurors while deliberating. Accordingly, we conclude that there was no abuse of discretion for Judge Dewey to have denied a new trial on these grounds.

In sum, we conclude that Judge Dewey did not abuse her discretion in denying the defendant's request for a new trial. Neither Eason's testimony nor P.M. and M.M.'s exchanges establish the existence of prejudicial juror misconduct that tainted the defendant's right to a fair trial. The defendant's juror misconduct claim is therefore meritless.

II

The defendant also argues that his constitutional rights to due process and a fair trial were violated by the ten year delay in scheduling the postremand inquiry and that Judge Dewey should have granted his request for a new trial on these grounds. Although we acknowledge that the delay in the present case is remarkable, we conclude that it did not adversely affect the defendant's ability to present his juror misconduct claim and therefore did not infringe the defendant's due process rights.

The following facts are relevant to the defendant's due process claim. After this court issued its decision in *Roman* in 2003, it appears that neither the parties nor the court took any action regarding the remand order until May 12, 2006, when the defendant's newly assigned counsel, Michael Georgetti, appeared before Judge Wollenberg. Georgetti explained to the court that he was having significant trouble in both contacting the attorney the defendant had privately retained prior to sentencing, Kay Wilson, and securing the cooperation of Eason. Georgetti asked Judge Wollenberg for a continuance for further time to contact Wilson and to secure Eason's appearance. Although Georgetti suggested two dates later that month on which to hold the hearing, Judge Wollenberg instead provided the parties with an open-ended continuance and instructed

Georgetti and the prosecutor to contact him whenever they were ready. There was no discussion of specific dates or a timeline by which to proceed.

In the years following the 2006 appearance before Judge Wollenberg, Georgetti continued to face difficulties in locating both Wilson and Eason. Throughout 2009 and 2010, Georgetti spoke with the Hartford caseflow coordinator several times about scheduling a status conference on the postremand hearing. Georgetti eventually managed to contact Wilson, although the information in her possession proved to be unhelpful in furthering the defendant's juror misconduct claim. Still unable to contact Eason and without any other sources of evidence, on March 10, 2010, Georgetti filed a motion to summon and examine the jury in order to question the individual jury members about potential misconduct during the defendant's trial. Judge Wollenberg then scheduled an in-chambers conference on the motion with the parties. Although Georgetti appeared at the meeting and was able to speak with Judge Wollenberg, the meeting produced no results, as a snowstorm prevented the prosecutor from reaching the courthouse. Georgetti subsequently attempted to reschedule the meeting, but was prevented from doing so due to Judge Wollenberg's illness and subsequent death.

In 2012, the presiding judge reassigned the defendant's case to Judge Dewey, who scheduled a hearing on November 20, 2012. At the hearing, Georgetti moved to withdraw from his representation of the defendant as he believed that he would likely be required to testify on the delay and his efforts to locate Eason. Indeed, at the 2013 evidentiary hearing on the defendant's juror misconduct claim, the defendant offered the testimony of Georgetti as well as Matthew Goetz and Marcie Hutt, criminal caseflow coordinators for the judicial district of Hartford, to testify as to the delay in scheduling the hearing.

Goetz testified that he worked as a caseflow coordinator in Hartford from 1998 to 2005, and his responsibilities included scheduling Judge Wollenberg's cases. At the time of Goetz' employment, the court's computer system did not track those cases that had been remanded for a hearing. To compensate for this, Goetz testified that of his own volition he kept daily lists of cases to be scheduled, but that he did not have any memory of ever scheduling a hearing after the remand order in *Roman*. In 2005, Goetz began a new position in the judicial branch and Hutt replaced him in the role of caseflow coordinator. Hutt used the same list system as Goetz to keep track of scheduling hearings. Although Hutt could not remember if she was the one who scheduled the initial hearing date in 2006, she testified that had Judge Wollenberg given her a subsequent date on which to schedule the hearing, she would have scheduled a hearing accordingly. Ultimately, Hutt did not do

so until 2012 when the presiding judge provided her with a date to schedule the hearing before Judge Dewey. Georgetti also offered testimony on the delay. He acknowledged that he could have taken more steps to prevent the delay, yet simultaneously stated that because the scheduling power rested solely in the court, he felt there was not much more he could have done as defense counsel to get the hearing scheduled.

Defense counsel also questioned Eason on the effect of the delay on her testimony, given that Eason's testimony was at times vague and imprecise about what she actually overheard the other passengers discussing on the bus. Regardless, Eason stated that had she been required to testify at an earlier point in time, her testimony would not have been any different. Eason also testified that her resistance to being called as a witness was due to her wish to avoid involvement in legal proceedings and that she only appeared at the hearing because she was under subpoena.

In his posthearing brief to the trial court, the defendant argued that the delay in scheduling the hearing violated his right to due process and a fair trial and was sufficient grounds for a new trial. Judge Dewey noted that "[n]either the trial court nor counsel were particularly aggressive" in ensuring that a hearing was scheduled, and denied the defendant's request for a new trial on those grounds.

When a defendant alleges that his right to a speedy trial has been violated, this court balances, on a case-by-case basis, the factors identified by the United States Supreme Court in *Barker* v. *Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). *State* v. *DePastino*, 228 Conn. 552, 560, 638 A.2d 578 (1994). These factors include: "[1] [l]ength of delay, [2] the reason for the delay, [3] the defendant's assertion of his right, and [4] prejudice to the defendant." *Barker* v. *Wingo*, supra, 530. We recognize that these factors "have no talismanic qualities" but rather "must be considered together with such other circumstances as may be relevant." Id., 533. We apply this same factual matrix to the defendant's claim that the delay in scheduling the postremand inquiry into juror misconduct violated his right to due process.

The "triggering mechanism" for our consideration of the *Barker* factors is the length of the delay that the defendant has experienced. Id., 530. As the tolerable length of delay may vary greatly between cases, our inquiry into the length of the delay "is necessarily dependent upon the peculiar circumstances of the case." Id., 530–31. Following our 2003 remand order in *Roman*, the defendant did not receive an evidentiary hearing until a full decade later. A delay of such great length is astounding at first glance, and, indeed, the state concedes that the ten year delay in the present case warrants our consideration of the remaining *Barker* factors.

After determining that there is a delay that requires our consideration, we examine the reason for the delay. Recognizing that there are diverse arrays of circumstances that may contribute to a delay in any given case, we place different weights on different reasons for the delay. Id., 531. For example, deliberate actions by the state to "hamper the defense should be weighted heavily against the government." Id. Likewise, "neutral reason[s] such as negligence or overcrowded courts" are weighted less heavily, but still weigh against the state due to a defendant's lack of control over such circumstances. Id. Additionally, a "valid reason, such as a missing witness, should serve to justify appropriate delay." Id. Finally, our case law recognizes a distinction between delays that arise due to individual failures and those that arise due to systemic problems. *State* v. *DePastino*, supra, 228 Conn. 562. When a delay may be ascribed to an individual failure rather than an institutional failure, the defendant must show actual prejudice. Id.

Given the length of time that elapsed in the present case, the reasons for the delay are numerous and varied. We find helpful the state's characterization of the ten year delay as having occurred in three stages: (1) the period between our 2003 remand order and Georgetti's initial 2006 appearance before Judge Wollenberg; (2) Georgetti's 2006 to 2010 quest to locate Eason and Wilson; and (3) the period between 2010 and 2013 when various individual blunders and unfortunate circumstances prevented scheduling the hearing.

In regard to the three years following our remand order in 2003, the record is devoid of any explanation that would indicate why the court did not schedule the defendant's hearing or why the parties did not request that the hearing be scheduled during this time. A turning point seems to have been in 2006, when Georgetti was appointed as the defendant's new counsel and Judge Wollenberg scheduled the first hearing pursuant to the remand order. It was at this hearing that Georgetti explained his difficulties in locating both Eason and Wilson and that Judge Wollenberg granted an open-ended continuance and instructed the parties to get in touch with him when they were ready to proceed. Significantly, the prosecutor indicated that the state was content with Georgetti receiving more time to locate the witnesses and did not attempt to hinder Georgetti in his efforts on the defendant's behalf. This stands in marked contrast to the facts in *Barker*, where the state deliberately delayed a defendant's trial for years in an attempt to first convict a codefendant. *Barker* v. *Wingo*, supra, 407 U.S. 516–19. In this regard at least, the delay in the present case does not weigh against the state. The majority of Georgetti's time between 2006 and 2010, was consumed by his attempts to find Wilson and to ensure Eason's cooperation. Gen-

erally, a delay that occurs due to the search for a missing witness is justified. Id., 531. Notably, however, the delay in the present case was catalyzed by the defendant's request for a continuance in order to gather more evidence, rather than the state seeking more time while the defendant was ready and waiting to proceed. A delay that results from a defendant's own request for more time cannot later serve as the basis for a due process violation. See *State* v. *Bonner*, 290 Conn. 468, 486, 964 A.2d 73 (2009) (delay was due in part to defendant's own requested continuances to conduct further evidentiary investigations).

Finally, between 2010 and 2013, a series of events occurred that, by their very nature, make it difficult for us to assign fault to any particular party. First, caseflow coordinator Hutt had difficulty finding a date which worked for Judge Wollenberg. As this matter was entirely out of the defendant's hands, any delay that resulted from it weighs against the state. The next delays, however, were the fault of no party. The 2010 meeting between the parties and Judge Wollenberg was cancelled only when a hazardous winter storm prevented the prosecutor from reaching the courthouse. Judge Wollenberg subsequently became ill, stopped hearing cases, and later died. As we cannot assign fault for the whims of the weather or the inevitability of human mortality, we conclude that any such delay that resulted from these circumstances is excusable. See *Barker* v. *Wingo*, supra, 407 U.S. 533–34 (delay caused by unexpected illness of case investigator was excusable).

The defendant attempts to cast the delay here as a widespread systemic failure akin to the institutional failures we condemned in *Gaines* v. *Manson*, 194 Conn. 510, 481 A.2d 1084 (1984). In that case, we determined that the failure of the state to provide a sufficient number of public defenders to indigent clients was a systemic failure that weighed heavily against the state and amounted to a deprivation of the petitioners' due process and equal protection rights. Id., 513–14, 527. There is no evidence, however, that would indicate that the delay in scheduling the defendant's hearing was due to some inherent failure—rather than an isolated, individual failure—in the court system. The defendant cites to the practice of the courthouse caseflow coordinators in making their own scheduling lists as evidence of an institutional failure. Not only is there nothing in the evidence to indicate that the system employed by Goetz and Hutt was anything more than an individual system used to manage their own job duties, there is also nothing that would indicate that their system was in any way responsible for the delay. Compare *State* v. *DePastino*, supra, 228 Conn. 561 (court reporter's failure to deliver transcript was individual, not systemic, failure).

Overall, nearly seven years of the delay is either unac-

counted for or was consumed by Georgetti's attempt to locate Eason. The remaining three years were due to unforeseeable circumstances and Judge Wollenberg's trouble finding a date on which to meet with the parties. As such, we conclude that although much of the delay was susceptible to reasonable explanation, the trial court's delay in setting a concrete date should weigh against the state. We observe, however, that trial courts should not take too rigid a stance in scheduling when defendants request additional time or an extension to locate witnesses or to obtain potentially exculpatory evidence. Flexibility in scheduling can provide defense counsel with the time needed to more comprehensively protect defendants' rights to present a full defense.

We next examine the defendant's assertion of his right to a timely postremand inquiry. The defendant's assertion of the right "is entitled to strong evidentiary weight in determining whether the defendant [has] be[en] deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied [due process]." *Barker* v. *Wingo*, supra, 407 U.S. 531–32. Accordingly, we observe that it may be helpful to note to what extent, if any, a defendant's failure to assert the right contributed to a delay. As Judge Dewey aptly noted in her memorandum of decision, neither the trial court nor counsel took a proactive approach to having the hearing scheduled.

As we have already observed, while the trial court did not take on an active role in managing the progress of the defendant's hearing, the defendant also did not himself take a particularly active approach in asserting his right to have the hearing scheduled and held. When considering the third *Barker* factor in the context of the present case, the record demonstrates that for three years following our remand order in *Roman*, the defendant took no action asserting his right to have a hearing scheduled. Although parties to a case have no individual control over the court calendar, a "wait and see" approach to scheduling is—as this case demonstrates—certainly unwise. Despite being represented by counsel, there is no evidence that the defendant ever contacted the court about scheduling the hearing during these first three years. The defendant's momentum in scheduling the hearing seems only to have accelerated upon Georgetti's appointment as the defendant's new attorney in 2006. Even then, another four years elapsed after the initial appearance before Judge Wollenberg before the defense filed its motion to summon the jury and asked for the hearing. Prior to that, the defendant filed no formal requests for a hearing. Georgetti apparently spoke informally with Judge Wollenberg about the hearing while at the courthouse on various occasions, but these conversations do not seem to have been formal requests by the defendant to schedule the hearing or indicate that he was ready to proceed. Although a missing witness may validly justify a delay, Eason's evasions

alone cannot fully explain the defendant's approach to asserting his right to a hearing, especially because three years of the delay occurred prior to Georgetti's attempts to contact Eason and for four years afterward the defendant filed nothing with the court asserting his right.[7] Thus, the defendant's failure to assert his right was also another reason for the delay itself. We conclude that the defendant's approach to asserting his right to the hearing weighs against him.

The final *Barker* factor concerns any prejudice that a defendant has experienced as a result of a delay. In considering prejudice, we recognize that "[i]f witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown." *Barker* v. *Wingo*, supra, 407 U.S. 532.

Despite the ten year delay that the defendant in the present case experienced, he was able to fully and comprehensively present his arguments concerning juror misconduct at the 2013 hearing. Although one alternate juror died prior to the hearing, the testimony of alternate jurors P.M. and M.M. does not indicate that the deceased alternate was involved in the communications between them. Additionally, as the deceased alternate juror did not deliberate, he could not have affected the verdict during the jury's deliberations. Even though thirteen years had elapsed since his trial, the defendant was still able to summon every member of the original jury to testify. Furthermore, all of the recalled jurors and alternates testified credibly and displayed few lapses in memory on important points, which is perhaps explained by the strong impression that sitting on the jury of a murder trial likely had on the citizens called upon to be jurors. Although Eason's testimony contains some moments in which she was uncertain of particular details of the conversation that she overheard on the bus, Eason's own testimony establishes that these uncertainties were not due to the decay of time. When asked by defense counsel whether her testimony would have been the same if she had been called to testify earlier, Eason indicated that her testimony at the 2013 hearing was the same as it would have been at any prior point in time. Thus, Eason's testimony—crucial to the defendant's claim—was not altered by the delay and therefore did not prejudice the defendant.

The defendant argues that, given that Judge Wollenberg had presided over the defendant's original criminal trial and, but for his death, would likely have presided over the postremand hearing if it had been held without delay, he was "deprived of his constitutional right to due process." We are aware, however, of no authority that requires the original judge in a matter to preside over every future iteration of the original matter.

Indeed, we have authority to the contrary, preventing trial judges from presiding again over a matter on which they were reversed on appeal. See General Statutes § 51-183c; Practice Book § 1-22 (a); *State* v. *AFSCME, Council 4, Local 1565*, 249 Conn. 474, 480, 732 A.2d 762 (1999). As Judge Dewey was able to observe and hear firsthand the testimony of all of the jurors and witnesses at the 2013 hearing, we cannot conclude that Judge Wollenberg's death was a factor that prejudiced the defendant. Overall, we conclude that the delay did not prejudice the defendant's ability to present his claim.

In balancing the *Barker* factors, we determine that the defendant's right to due process was not violated. Even though the delay in the present case was unusually long, it did not prevent the defendant from fully presenting his juror misconduct claim. Although the fact that Judge Wollenberg did not schedule a concrete date does weigh against the state, the defendant's own failure to assert his right to the hearing weighs heavily against his claim. Finally, and importantly, despite the delay, the defendant was able to call the witnesses crucial to his juror misconduct claim, all of whom testified credibly and without any serious lapses in memory. We therefore conclude that Judge Dewey properly rejected the defendant's claim that the delay violated his right to due process.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] As Judge Dewey later observed, members of the jury could not have been on the bus, as they would have been reporting to the courthouse in Hartford at approximately the time of Eason's observations, not taking a bus in the opposite direction.

[2] We refer to the jurors by their first and last initials in order to protect their privacy interests. See *State* v. *Gonzalez*, 315 Conn. 564, 569 n.3, 109 A.3d 453 (2015).

[3] We initially transferred the defendant's appeal to the Appellate Court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1, but later transferred the appeal back to this court on the motion of the state. See Practice Book § 65-2.

[4] Alternate juror M.M. did testify that he shared details about what was "going on" in the trial with his wife. The defendant, however, did not raise this communication as independent grounds for a mistrial at the postremand hearing, nor does he do so before this court.

[5] The defendant posits that we should treat the alternate jurors as third parties during the time they were sitting in the jury box and still sworn in as jurors. To be sure, we do recognize a distinction between regular jurors and alternate jurors, particularly after the latter have been dismissed prior to deliberations. See *State* v. *Apodaca*, 303 Conn. 378, 387–89, 33 A.3d 224 (2012) (alternate juror cannot be recalled to serve as regular juror on same case following dismissal). To hold that alternate jurors are third parties during their jury service would create innumerable difficulties, as alternate jurors and regular jurors unavoidably come into contact with one another. As trial courts instruct all jurors not to discuss the case amongst each other prior to deliberation, and we presume that jurors follow the instruction of the trial court unless there is evidence to the contrary; *State* v. *Parrott*, 262 Conn. 276, 294, 811 A.2d 705 (2003); we do not believe that treating alternate jurors as third parties during trial would significantly further any interest in protecting the fair trial rights of defendants. To be clear, prejudice may arise if an alternate juror contacts a regular juror following the alternate's dismissal from service. There is, however, no such allegation in the present case. The Arizona decision that the defendant cites for the proposition that

alternates should be treated as third parties is distinguishable on these very grounds. See *State* v. *Miller*, 178 Ariz. 555, 557, 875 P.2d 788 (1994) (dismissed alternate juror left note opining on defendant's guilt on windshield of regular juror's car).

[6] Defense counsel only questioned D.C. about the other jurors' acts despite having the opportunity at the postremand inquiry to ask the other jurors as well. To pass by this opportunity only to argue before this court that it is *possible* that the other jurors *may* have seen P.M. and M.M.'s actions strikes us as a somewhat disingenuous approach.

[7] It is undisputed that Eason was opposed to appearing as a witness, but we observe that the defendant's counsel at the 2013 hearing was able to secure Eason's appearance, under subpoena, in a matter of a few months.

———————————————————